## VAN WEEL *v.* WINSTON & Others.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE NORTHERN DISTRICT OF ILLINOIS.

Argued October 21, 22, 1885.—Decided November 2, 1885.

Unless transactions set forth in a bill in equity constitute a fraud or breach of trust, for which the court can give relief, charges that the acts set forth are fraudulent are not sufficient grounds of equity jurisdiction.

A bill in equity by a holder of railway mortgage bonds against the president of the company, which alleges that the defendant received money from the sale of the mortgage bonds, but does not aver that the creditor has obtained judgment against the company upon his bonds, and that execution issued on the judgment has been returned *nulla bona*, shows nothing entitling the plaintiff to relief in equity as a creditor of the company.

The president of a railway company holds no fiduciary relation to mortgage bondholders of the company which requires him as their trustee or agent to see to the proper application of the funds received by the company from the sale of the mortgage bonds, or to account to the bondholders for any surplus from the proceeds of their bonds after constructing the works for which they were issued ; his relations and duties in these respects are to the company and its stockholders, not to creditors of the company.

A, as president of a railway company, and acting in its behalf, signed and caused to be issued a circular inviting subscriptions to mortgage bonds of the company issued for the purpose of constructing "a branch from the main line to Atchison, Kansas, a distance of about fifty miles." The mortgage made to secure these bonds described the road as "the branch railroad of said party of the first part as the same now is or may be hereafter surveyed and being constructed, and leading from the Missouri River . . . at a point opposite . . . Atchison . . . by the most practicable route, not exceeding fifty miles in length, to a junction with the main line." The bonds were further secured by a second mortgage on the main line. The branch road, as located and constructed, was only twenty-nine miles in length. The first mortgage on the main line was subsequently foreclosed, whereupon B, a holder of a branch mortgage bond, commenced proceedings to foreclose that mortgage, which resulted in a foreclosure and sale of the branch to C, also one of the bondholders. B then filed his bill in equity against A personally, on behalf of himself and other holders of the branch mortgage bonds, among whom was C. The bill set forth the above facts ; and the relief sought for was redress against an alleged fraud in the representation that the proposed branch would be, "about fifty miles in length." On demurrer, *Held* :

1. That the representations in the circular were representations of the company, and were in no respect the personal representations of A.

2. That the complainant had no right to rely on the statement concerning the length of line as materially affecting his security.
3. That it was the duty of persons purchasing the bonds to look to the mortgage for the description of the property mortgaged to secure them.
4. That the description in the mortgage contemplated that if the best interests of the company should require a line shorter than fifty miles, the company should have the right to adopt it.
5. That the bill showed no right in the complainant to use the names of the company or stockholders to obtain redress for a tort committed on them, and no equities in these respects against A.
6. That the bill showed no privity between A and the bondholders as to his use of money which they had loaned to the company.

The original bill in this case was filed December 12, 1876. The amended and supplemental bill, on which judgment was rendered below, was filed May 22, 1880. Van Weel, an alien holder of bonds of the Chicago and Southwestern Railway Company of Iowa and Missouri, secured by mortgage on the Atchison Branch of that road, was complainant. The railway company, and Frederick H. Winston and Campbell, both citizens of Illinois, were defendants. Winston was former president of the company. The trustees of the mortgage of the Atchison Branch, viz. : Burnes of Missouri and Dows and Frederick S. Winston of New York, were also made parties defendant, but were not served with process. Dows appeared voluntarily. The other trustees did not appear. The bill alleged that there were several intervening petitioners, joining as complainants, among whom was one Johannes Berg, also a bondholder. The bill, after setting forth the formation of the company, and a business connection with the Rock Island Railroad Company, made sundry allegations respecting fraudulent obtaining of the money of the complainants for the construction of the Atchison Branch, by the issue of a circular inviting subscriptions to the mortgage branch bonds. These averments are transcribed verbally in the opinion of the court, *post*, pp. 239, 241, to which reference is made.

There was attached to the bill, as an exhibit, a copy of the mortage of the branch road. It was recited in this mortgage that the railway " company has acquired and now possesses the right, under and by virtue of the laws of the State of Mis-

souri, to construct, maintain, and operate a branch railway from the Missouri River, opposite the city of Atchison, Kansas, by the most practicable route, not exceeding fifty miles in length, to a junction with the main line of the said first party; and whereas, the said first party has already commenced the construction of said branch line and stands in need of money to complete the same."

The property mortgaged was described in the following language: "All and singular, the branch railroad of the said party of the first part, as the same now is or may be hereafter surveyed, and being constructed and leading from the Missouri River, in the State of Missouri, at a point opposite the city of Atchison, in the State of Kansas, by the most practicable route, not exceeding fifty (50) miles in length to a junction with the main line of the railway of said first party, together with all and singular the right of way for said branch road belonging to the party of the first part," &c. There were several other provisions in the mortgage, of which only the following are material in connection with the opinion of the court. "The said party of the first part hereby agrees to and with the said parties of the second part that the amount of bonds issued hereunder shall not exceed in the aggregate the sum of one million of dollars upon the whole of said branch line of railway from said Missouri river to said main line of the said Chicago and Southwestern railway, a distance not exceeding fifty miles. . . . Said Chicago and Southwestern Railway Company further covenant and agree that the money borrowed or procured for the purpose aforesaid, upon the security of said bonds, shall be faithfully applied to the building and completing of said line of railway, and to no other purpose, and that said application shall be made with due diligence."

The principal fraud (so far as considered in the opinion of the court) was charged in the following language: "Your orator further states that it was also untrue, and known to be untrue by said Frederick H. Winston, that said branch line was designed to be fifty miles in length, and therefore, with the intention to mislead and deceive the purchasers of said proposed bonds, said branch was stated in said circular to be 'about'

fifty miles in length, and your orator says that before said circular was issued a contract had been entered into with one H. M. Aller for building said branch, and said Winston then knew it would not be over twenty-nine miles in length. Your orator further states that it was untrue that it was intended by said Winston that said line should pass through the counties of Buchanan, Clinton, and Platte, as stated in said circular; that said line did not, in fact, enter the county of Clinton; but your orator states that said Winston, with intention to deceive and mislead the purchasers of said proposed bonds, caused a map to be attached to said circular, whereon the junction of the branch and main line appeared to be near Cameron, and showing that said branch would, of necessity, pass through said Clinton county."

After making some other allegations referred to in the opinion of the court, the bill further charged that the complainants and other purchasers of the bonds were induced by these fraudulent representations to purchase them; that the whole sum realized from their sale was first deposited with the Rock Island Company, and then came into the hands of "Winston and his confederates" "in trust to be faithfully expended in the building and completion of said branch road;" that the parties who loaned the money for the construction of the branch road were defrauded of their promised security to the extent of twenty-one miles; that Winston, while acting as president, made a large profit in the construction of the branch, the larger part of which he converted to his own use, and the remainder divided among confederates; that the road was not properly constructed; that the branch road from the outset was substantially valueless; that Winston, as president, did not faithfully apply the sums received from the Rock Island Company, in the building and completion of the branch road, but converted them to the use of himself and associates; that the mortgage on the main line was foreclosed at the instance of the Rock Island Company, and the mortgaged property sold and conveyed to the purchaser at the forclosure sale; that the complainant then instituted his suit to foreclose the mortgage on the branch road, and obtain judgment of foreclosure, and the mortgaged prop-

erty was sold under the foreclosure, to Johannes Berg for $10,000; that after these foreclosures the Southwestern Railway Company was divested of all its property, franchises, power and capacity to carry. on business as a railroad company, and to carry out the purposes for which it was incorporated; that the Southwestern Company has failed to call to an accounting Winston and his associates, although requested by complainant so to do, with like allegations as to the trustees of the mortgage, who were made defendants, but not served with process; that these facts became known to complainant only shortly before the bringing of this bill; that Winston had fraudulently concealed from the complainant the fact of his interest in the construction of said road, so that the same was not discovered till shortly before the bringing of this suit; and that sufficient bonds of indemnity had been tendered to F. S. Winston, Burnes and Dows, trustees under the mortgage, with a request that they should appear as defendants, and that Dows had appeared, but the other trustees had refused and neglected to appear. The relief asked for was the following: "That the defendants, Frederick H. Winston and George C. Campbell, may be required to render a full, strict, and exact account of their and each of their transactions in relation to the business of the Chicago and Southwestern Company, and particularly the Atchison Branch thereof, from the 1st day of June, A.D. 1871, to the present date; that the amount of moneys, bonds, stocks, subscriptions, lands, or parcels of land received or taken by said Chicago and Southwestern Railway Company, or by said Frederick H. Winston and Campbell, or either of them, in connection therewith or in any way relating to said branch railway, be ascertained; that all proper disbursements or expenditures of moneys, bonds, stocks, or other property, made in the necessary construction of said branch railway, be also ascertained, and that the defendants, Frederick H. Winston and Campbell, may be charged by the decree of this court to pay the ascertained balance of receipts above proper expenditures; and if it shall appear that said Winston or Campbell, or either of them, have now in their possession or under their control any of the bonds or stocks subscribed or donated in aid of

said branch railway, and which by virtue of said contract or otherwise became the property of said Southwestern Company; or if said Winston and Campbell, or either of them, or if any other person or persons in trust for them, or either of them, hold any lands, or parcels of land, or interests in either, derived directly or indirectly through or by means of their, or either of their connection with said railway or branch, or in aid of the construction of said branch, that they be required by the decree of this court to account for and surrender the same as this honorable court shall hereafter direct. And that if it shall appear that the said Frederick H. Winston and the said Campbell, or either of them, misapplied and converted to their own use any portion of the said fund so advanced by your orator and the other purchasers of said bonds, as aforesaid, in trust to be expended in the construction of said branch road, that they may be respectively charged with the amount so converted and misapplied by them, as well as all other amounts which they aided and caused to be applied for other purposes than the building and completion of said road; and that they be decreed to refund and restore the same to your orator and the other purchasers of said bonds, by whom or in whose behalf the said fund was so advanced as aforesaid; or, if some other method of relief shall appear more consistent with the character of this case, as it may be disclosed, your orators pray that said defendants, Winston and Campbell, may be required to pay into court the just and full sum due your orator upon said bonds, assuming and declaring the same to be due, together with the interest thereon, as in said bonds is provided, and that upon such payment being made, together with such further costs as may properly be imposed, your orator may surrender his said bonds for cancellation, or otherwise, as may be ordered; and that your orator may have such other and further or different relief as to equity shall seem meet."

Winston demurred to this bill on the ground of nonjoinder of indispensable parties; because other indispensable parties (F. S. Winston and Burnes) had not been served with process; that the bill was multifarious; that there was no privity be-

tween complainant and defendant; that the complainant had a complete and adequate remedy at law which he had not exhausted; that the complainant had no right to commence a suit in his own name; that the supposed cause of action did not accrue within five years next before filing the amended bill; that the amended bill set up new causes of action; that when the Southwestern Railway Company was first made party in an amended bill, the alleged causes of action were barred; and that the bill did not state a case for relief in equity. The demurrer of the defendant Campbell was to the like effect. The railway company also demurred.

The cause was heard below, on the amended bill and demurrer, before Mr. Justice Harlan, August 1, 1881. He held, as to the alleged fradulent representations in the circular, that if a fraud was committed the remedy was adequate at law; that as to the alleged violations of duty by Winston as president, and conversion to his own use of moneys realized from sale of the bonds, the right of action was barred by the statute of limitations; and that no trust was disclosed by the bill to exempt the complainant from the operation of the statute. The demurrers were accordingly sustained, and the bill was dismissed. Whereupon the complainant appealed to this court.

*Mr. William H. Moore* [*Mr. James K. Edsall* was with him on the brief] for appellant.

I. The fund derived from the sale of the bonds was set apart, by the covenant of the Chicago and Southwestern Railway Company contained in the mortgage, as a trust fund to be faithfully applied to no other purpose than the building and completion of the road mortgaged to secure the payment of the bonds sold to raise such fund.

II. The bill avers that the defendant, Frederick H. Winston, obtained possession of this trust fund, and in violation of the terms of the trust converted a large part thereof to the use of himself and his confederates.

III. Equity has jurisdiction for the violation of a trust of this character. This jurisdiction will be sustained when time,

expense and multiplicity of suits will be saved thereby, as also when the case contains an element of trust. *Oelrichs* v. *Spain,* 15 Wall. 211, 228; *May* v. *Le Claire,* 11 Wall. 217. This does not belong to the class of trusts where courts of law have concurrent jurisdiction with courts of equity, like bailments, and cases where an action for money had and received can be maintained. 1 Story Eq. Jur. § 60. An action at law for money had and received, &c., could not have been maintained by the holders of the bonds to recover the trust fund misappropriated. By the terms of the trust, this fund was not to be repaid to the purchasers of the bonds. They merely had an equitable right that the money should be expended in the building of the road in accordance with the terms of the trust, and thus give value to their mortgage security. Their interest in the trust fund was an equitable interest. Moreover, in order to ascertain the amount of the unexpended balance of this fund, which was misappropriated by the defendant Winston and his confederates, there was involved an investigation of the complicated accounts of the company, showing how much was actually received as the net proceeds of the sale of the bonds, and what portion thereof was expended in the construction of the branch road. There was no adequate remedy at law. Equity will not decline jurisdiction because there may have been some possible or partial remedy at law. See *Boyce* v. *Grundy,* 3 Pet. 210, 215; *Oelrichs* v. *Spain,* above cited; *Watson* v. *Sutherland,* 5 Wall. 74.

IV. The bill shows that the scheme to obtain and misappropriate this trust fund to the use of the appellees and their confederates, was planned and carried out by means of fraud. It is true the fraud practised by Winston appears to have been done by him while assuming to act as president of the railroad company. The circulars purported to be signed by him as president of that company; yet the bill shows that this fraud was practised in order that he might convert this money to his own use and advance his own personal interests. The fact that he assumed to act as the president of the corporation in the perpetration of the fraud, will not screen him from personal accountability therefor. *Reed* v. *Peterson,* 91 Ill. 288, 297; *Arnot*

OCTOBER TERM, 1885.

v. *Biscoe*, 1 Ves. Sen. 95; *Seddon* v. *Connell*, 10 Sim. 58, 86; *Salmon* v. *Richardson*, 30 Conn. 360. Equity has always jurisdiction in cases of fraud and misrepresentation. *Jones* v. *Bolles*, 9 Wall. 364, 369.

V. Bondholders may maintain suit in their own names, and obtain relief from a court of equity for a violation of the trust. It is within the court's power to recover the fund from Winston the trust , who has wrongfully converted it to his own use, and distr ute t among the purchasers of the bonds according to their i spec ive equities. The general rule undoubtedly is that a cre litor must reduce his demand to judgment, and have execution issued and returned *nulla bona* before he can call upon a court of equity to aid him in its collection. *Greenway* v. *Thomas*, 14 Ill. 271. This rule is based upon the principle that equity will not interfere where there is a plain and adequate remedy at law. But in the present case it is manifest that there is not a plain and adequate remedy at law. The debtor corporation is virtually extinct. Not only has all its property been sold, but its very right to transact business, to own and operate a railroad—its franchises—have also been sold out under the mortgages. In the language of this court in *Ribon* v. *Railroad Companies*, 16 Wall. 451: "It has been stripped of all its property and effects, and only cumbers the ground."

The corporation is virtually extinct. The sale of its property and franchises amounts to a voluntary dissolution. *Slee* v. *Bloom*, 19 Johns. 456; *Moore* v. *Whitcomb*, 48 Missouri, 543. Frauds of the character set forth in the bill confer jurisdiction in equity. *Jones* v. *Bolles*, 9 Wall. 364. The brief of the counsel also discussed at length the questions of multifariousness, defect of parties, and statute of limitations, raised by the demurrers, but not considered in the opinion of the court.

*Mr. W. C. Goudy* for appellees Frederick H. Winston and executors of Campbell [*Mr. Melville W. Fuller* also filed a brief for the appellee F derick H. Winston].

Mr. Justice Miller delivered the opinion of the court.

This is an appeal from a decree of the Circuit art of the

Northern District of Illinois, dismissing the bill of Van Weel, who was plaintiff below and is appellant here.

The original bill was filed December 12, 1876, and several amended bills were filed, until, on May 22, 1880, complainant filed what he calls his amended and supplemental bill, substituting it in lieu of his previous bill and amended bills.

The defendants named in this bill are the Chicago and Southwestern Railway Company of Iowa and Missouri, Frederick H. Winston, and George C. Campbell, citizens of Illinois, Calvin F. Burnes, a citizen of Missouri, and David Dows and Frederick S. Winston, citizens of New York.

Mr. Van Weel describes himself as an alien, and a subject of the King of the Netherlands, and a holder and owner of bonds of the Chicago and Southwestern Railway Company for $67,000 principal, and overdue interest on them to the amount of $35,175. He brings this suit, as his bill alleges, not only for himself, but on behalf of numerous other holders of the same issue of bonds, whose names he gives, to the amount, including interest, of $671,000.

The bill was demurred to, the demurrer was sustained, and a decree rendered dismissing it, from which this appeal is taken.

The contest seems to be mainly between complainant Van Weel on one side, and Frederick H. Winston on the other. Calvin Burnes, a citizen of Missouri, has not been served with process within the Northern District of Illinois, and has not appeared by himself or attorney. The same may be said of Frederick S. Winston, who is a citizen of New York.

F. H. Winston has demurred separately, and if the bill cannot be sustained against him it is obvious, from its character, that it is not good against the other defendants. The Chicago and Southwestern Railway Company also demurred.

The bill is a long one, the allegations are not classified, nor the true foundations of relief very clearly stated. It is full of the words fraudulent and corrupt, and general charges of conspiracy and violation of trust obligations. Mere words, in and of themselves, and even as qualifying adjectives of more specific charges, are not sufficient grounds of equity jurisdiction, unless

the transactions to which they refer are such as in their essential nature constitute a fraud or a breach of trust, for which a court of chancery can give relief. *Ambler* v. *Choteau*, 107 U. S. 586, 590.

The charges in this bill on which relief is sought may be arranged under two heads:

1. Fraudulent misrepresentations of the defendant affecting the character and value of the security on which the bonds in question were negotiated.

2. The violation of certain obligations, in the nature of a trust, which he assumed in regard to the security and ultimate payment of the bonds.

A few of the most important matters applicable to both these charges as found in the bill may be thus stated:

A company had been incorporated under the laws of Iowa to build a railroad from the town of Washington in that State, on the line of the Chicago, Rock Island and Pacific Railroad Company, in a southwesterly course to the Missouri River, or to the line of the State of Missouri in that direction. Another corporation had been organized under the laws of Missouri to build a railroad in that State, from a point opposite the city of Leavenworth, in Kansas, to the Iowa State line, in the direction of the city of Des Moines in that State.

These companies were consolidated into one, under the name of the Chicago and Southwestern Railway Company, with the declared purpose of building a single road from Washington to the Missouri River, at a point opposite Leavenworth. Of this company Mr. Frederick H. Winston became the president and a member of the executive committee of its board of directors. The company issued bonds for $5,000,000, which were guaranteed by the Rock Island Company, and made a mortgage on the entire line of its road to secure their payment. The length of this line was 266 miles, and the money raised on these bonds secured its rapid completion. In the mean time another corporation had been organized in Missouri to build a road from the Missouri River, opposite the city of Atchison in the State of Kansas, to some point on the line of the Chicago and Southwestern road. This road was called the Atchison

Branch, and when the main branch of the Southwestern road was nearly finished, lacking, as the bill avers, only fifty miles of its completion, a consolidation was effected between the company organized to build this branch road to Atchison and the original Chicago and Southwestern Company, in which consolidation the corporation retained the name of this latter company.

This company, as consolidated, at once determined to raise a new loan of $1,000,000, to be used mainly for the purpose of building the Atchison Branch road, on which but little, if any, work had been done. As a security for the bonds of this loan, they made another mortgage, which was a first mortgage on the Atchison Branch, and a second mortgage on the main line. These bonds were all sold, and the two lines of road completed within a reasonable time; and it may as well be added, that both mortgages were forfeited in a few years for non-payment of interest, and the mortgages foreclosed by a sale of the roads under two different foreclosure suits.

The charge of actual fraud against Mr. Winston grows out of certain acts and representations made by him in connection with the sale of these bonds by the Chicago and Southwestern Company.

In order that no injustice may be done the complainant in regard to his allegations on this point, the language of the bill will be here given:

"Your orator further complains and states that the said Frederick H. Winston and his confederates afterwards, to wit, on or about the first day of June, A.D. 1871, contrived and entered upon a scheme to secure a loan of the further sum of $1,000,000, for the ostensible purpose of building a branch line of road as hereinafter stated, but in reality to enable him and his confederates to get control of, and convert to their own use, a large part of the funds secured and advanced to build said branch road. And to that end, said Winston, as president of said Southwestern Company, caused a circular to be issued, a true copy of which is hereto annexed, marked Exhibit 'A,' to which reference is made as if it was incorporated herein, in which, among other things, speaking as president of said Southwestern Company, he said:

"'On the first day of May, 1871, the Chicago and Southwestern Railway, from Washington, Iowa, to Leavenworth, Kansas, a distance of 266 miles—now finished and in operation, 216 miles—will be fully completed and opened for business under the auspices and management of the Chicago, Rock Island and Pacific Railroad Company. The two roads, thus under one management, will constitute a through line and the shortest through line from Chicago and the Great Lakes of the North to the extreme Southwest. Congratulating our friends and ourselves upon the prompt sale of our first issue of bonds, as well as their present established market value, both in this country and in Europe, we would present for sale, through the financial agents of the company, a second issue, for the purpose of constructing a branch railroad from the main line to Atchison, Kansas, a distance of about fifty miles.'

"Said Winston, after setting forth the advantages of Atchison as a commercial and railway centre, continued as follows :

"'To carry on the arrangements before stated, the Chicago and Southwestern Railway Company have issued one thousand bonds, dated June 1, 1871, each for one thousand dollars, due thirty years after date, with semi-annual coupons annexed, at the rate of seven per cent. per annum, principal and interest payable in American gold coin, at the American Exchange National Bank, in the city of New York ; all of which are equally secured by a first mortgage on the road to be built, its assets, rights of way, earnings, and other property, as well as by a second mortgage upon the Chicago and Southwestern Railway, its property and franchises.'

"It was further stated in said circular that said mortgage would be 'a safe and reliable security,' the value of which would be better appreciated by the fact that the 'Chicago, Rock Island and Pacific Railroad Company had already agreed to lease, and would, when completed, operate the whole line' on terms that would pay a handsome dividend to the stockholders, and 'which in no event' would be 'less than the interest on all the bonds outstanding,' and that the value and security of the contract aforesaid was 'equal to a direct indorsement of the bonds' by the Rock Island Company.

" It was further stated in said circular :

" ' The Chicago and Southwestern Railroad, for over two hundred miles west from Washington, is pointing almost directly to Atchison, so that its extension to that place involves less c.rvature than that of the established line to Leavenworth.' ' The Atchison Branch, through the populous counties of Buchanan, Clinton and Platte, offers railroad facilities to wealthy agricultural communities, which in return must afford a heavy and lucrative local traffic. Every tract over which it will pass is a farm teeming with the abundant products of the famous Platte purchase.' ' With the offering of the first loan of the Chicago and Southwestern Railway Company, we were admonished, as the originators of a now enterprise, to avoid the language of eulogy and enthusiasm. Difficult as was the task to those who knew its real merits, we have compensation now in a final and complete success, far beyond any expectation we dared to hope to excite by any statement in our former publication. Reviewing with a just pride all that was then written, we feel authorized to claim the confidence of the numerous friends, both in Europe and in this country, of the Chicago and Southwestern Railway Company, to whom we have more than verified all our statements.' ' To complete the connections of the Chicago and Southwestern Railway, to extend its power and usefulness, and to increase its business and earnings, by the construction of the Atchison Branch, we now offer this loan, and commend it to our friends as a safe and desirable investment.' Dated ' New York, June. 1871, and signed ' F. H. Winston, President.' "

The falsehood and fraud in these representations is in the alleged fact that the branch road, when built, was only twenty-nine miles and not fifty, whereby the bondholders were deprived of the security of twenty-one miles of road which they had a right to expect to make good their bonds, and that it was known to Winston at the time that the road would not be as long as thus represented, and would not go through all the counties named. There was one of these counties in point of fact not touched by the road.

The first observation to be made on this subject is, that cir-

culars, on which this allegation is founded, are exhibits to the bill, and, in every instance, they are clearly the circulars of the Chicago and Southwestern Railroad Company.   They are signed by Mr. Winston as president of that company, and purport to be issued from its office, and in the charging part of the bill, copied above, and all through it, he is said "to be speaking as president of that company."   There is no allegaation anywhere that Winston ever gave his personal pledge or statement to any one about to invest in the bonds of the company that the road would be fifty miles long, or any other length.   It is obvious, from the nature of these circulars, that the branch road had not then been located, and Mr. Winston, as an individual, could give no pledge on that subject which would bind the company, nor could he do so as president of the company.   The road had yet to be located, and this could only be done by the board of directors, of whom Mr. Winston was but one of eight or ten.

A source of much safer reliance as to the security which these purchasers of the bonds were getting, was the mortgage given by the company.   This of course was made and recorded before the negotiation for the loan was commenced, and copies of it accompanied the bonds when offered for sale.   Every prudent man, knowing that this mortgage was his main security, would examine it, or his agent would, before investing his money.

In this mortgage or deed of trust, the trustees being David Dows, Frederick S. Winston, and Calvin F. Burnes, the property conveyed is described as "the branch railroad of said party of the first part, as the same now is or may be hereafter surveyed and being constructed, and leading from the Missouri River, in the State of Missouri, at a point opposite the city of Atchison, in the State of Kansas, by the most practicable route, not exceeding fifty miles in length, to a junction with the main line of the railroad of said party of the first part."

Whatever representation may have been made in the circulars of the company was, according to all rules of evidence, superseded by this solemn instrument between the parties.   If they differed in any respect, the latter must be looked to as the

security on which the bondholders alone had a right to rely. This instrument, so far from giving any pledge or assurance that the branch road should be fifty miles long, or near that, is careful to say it shall not *exceed* that length.   The limitation is in its length, not its shortness.   The latter is provided for by saying that it should be by the *most practicable route.*

It is impossible to read this description of the line of road, conveyed as security for the bonds, without seeing clearly that the line was not yet located—that its future location was to be governed by two considerations : 1. That it should be the most practicable route between Atchison and the main line of the road, and 2, that its length should not *exceed* fifty miles. If the most practicable line, by which is evidently meant the best working line for the company who was building it, should require a shorter line than fifty miles, there is not the shadow of a promise or suggestion that it should not be so long, and no longer, as that required.   But in the provision that its length should not exceed fifty miles, there was a protection against wasting the money received from the bondholders on a long and unprofitable line of road made only for the benefit of people living along that line.

But this line of road was not the only security for the payment of these bonds.   The mortgage included also the entire main line from Washington to Leavenworth, 266 miles, which was now nearly completed.   This made a direct connection between the rich agricultural country of western Missouri and the city of Chicago by means of the Chicago, Rock Island and Pacific Company, then a rich and prosperous corporation, so deeply interested in this Southwestern Railway that it had guaranteed $5,000,000 of the bonds of the company.   It was further stipulated in this mortgage or deed of trust that the proceeds of the sale of these bonds should be placed in the hands of the Rock Island Company, which should only pay them out in the regular prosecution of the work.   It was further provided in that mortgage that if any of these proceeds remained with that company after the completion of the road it should be paid over to the president or other authorized agent of the Chicago and Southwestern Company.

It cannot be doubted that this mortgage on the main line, though a second lien, was regarded as an important part of the security of the bondholders under it, and when taken in connection with the aid and interest of the Rock Island Company, the precise length of the branch line could not have been held to be very important. In fact, as the two lines belonged to one company, and that company was liable for all the bonds, it was obviously the interest of the bondholders and of the stockholders that the branch line should be so located as to make it add to the profits of the entire enterprise on which the bondholders held a lien.

In regard to the allegation of fraud in this matter it is apparent—

1. That all that is charged against Mr. Winston is that he signed or permitted his name to be affixed to a circular which stated the probable length of the branch road, then unsurveyed and unlocated, as about fifty miles.

2. That the place of junction with the Southwestern road, which necessarily determined the length of the branch road, was not described or mentioned.

3. That in the mortgage which was made on said branch road, all that was said was, that it should not exceed fifty miles.

4. That it is nowhere averred that the line was not properly located, or that it should have been located otherwise.

5. That the security which the bondholders had upon that line and the other seemed to render the place of connection between the branch and the main line unimportant, as regards the security for their loan.

We are of opinion, therefore, that the complainants had no right to rely on the statement concerning the length of the line as materially affecting their security, and that Mr. Winston committed no fraud in the part he took in that matter. This view is reinforced by the admission of the bill, that the branch road was completed mainly out of the money arising from the bonds sold to plaintiff and others, and that several years after both it and the main line had been finished and in operation, both roads were sold under the two mortgages;

that the branch line was sold under foreclosure proceedings inaugurated by Van Weel, and was bought in for $10,000 by Mr. Berg, one of Van Weel's associates as bondholder; and that they now, as far as appears, own the road their money was used to build.

Other transactions are mentioned as fraudulent, such as that Mr. Winston converted some of the money arising from these bonds to his private use, and not to the purposes of the company. The answer to this is, that Mr. Winston came under no obligation to see to the application of this money as the bondholders might think it ought to be applied. They had bought their bonds, paid their money, and received their security. The money so diverted was the money of the Southwestern Company, and not their money.

The wrong done by Winston in that matter, if wrong there was, was done to that company, and not to the bondholders. They had provided their own means of insuring the building of this branch road, by disbursing the money through the Rock Island Company, and it was successful. The road was built. There was no privity between Mr. Winston and these bondholders as to *his* use of money which they had loaned to the company, which was no longer their money. The error which pervades the bill throughout is to treat this corporation, to which the bondholders loaned their money, as if it had no existence, as if they had loaned it to Mr. Winston and held his personal obligation that it should all be honestly applied, and be responsible for the repayment of the loan. If Mr. Winston cheated this company out of its money, the right to redress for that wrong is in the company or in its stockholders. As a creditor of the company, Mr. Van Weel has no right to interfere in the matter until he has a judgment against the company, with an execution returned *nulla bona.* He has not in this suit shown any right to use the name of the company or of its stockholders to obtain redress for a tort committed on them. *United States* v. *Union Pacific Railroad Co.,* 98 U. S. 569, 614.

There are probably other allegations of fraud, but they are no better founded than these, and we can give them no further attention.

As regards the matter of trust, which is one of the grounds of relief set up in the bill, we need not occupy much time in its consideration.

The trustees in the mortgage, which is the only express trust that we can find set out in the bill, were Frederick S. Winston, David Dows, and Calvin Burnes, neither of whom resides within the jurisdiction of the court, or has been served with process.

If, however, they were before the court, they are not charged with any breach of the duty with which they were entrusted.

The application of the money arising from the mortgage bonds was not by the mortgages entrusted to them, nor had they any control over it after the bonds were sold.

It is not alleged that they refused to foreclose the mortgage when it became forfeited by nonpayment of interest, or that they failed to perform any duty imposed upon them by the mortgage.

It is asserted, however, that Frederick H. Winston, as president of the company, was bound to see that the money raised on these bonds was used exclusively in the construction of the branch road, and that, in this regard, he was a trustee for the lenders of the money. We are unable to see any such trust in the matter.

The contracting parties in regard to this loan were the bondholders and the Southwestern company. The one became debtor for the money loaned, the other became creditor. Mr. Winston, as the president of the company, represented the company, the borrower. The lenders desired a security for the repayment of their money, which they obtained in the mortgage, and their trustees in that trust were Dows, Burnes, and F. S. Winston. They, in that instrument, undertook to secure the building of this road out of the money loaned, by requiring its deposit with the Rock Island Company, and its disbursement, for that purpose, under its supervision. But if the loan should produce more than was necessary for that purpose, what was to become of it? Was it to go back to the lenders? There is no hint of the kind. It was impracticable to do so, because the bonds would, many of them, have changed hands. As to the new owner, it would have been a mere

gratuity to return it. And the original lender had no interest in the matter. Instead of this, it is expressly declared that the Rock Island Company could relieve itself of further obligation in the matter by payment to the president of the company. When thus paid, did he hold it as trustee for the bondholders? If so, under what trust or what obligation? Could he return it to the bondholders, with the bonds still outstanding against the company? Or did he hold it merely as the representative of the company of which he was president? We think it was clearly the money of the company, and could have been used by it for the purchase of rolling stock, general equipment, or any other legitimate use of its own money.

This money belonged to the company. The road was built —the only interest in the nature of a trust which the lenders had attempted to protect by the control of the funds. The obligation of Mr. Winston in the disposition of the money, if any of it came to his hands, was to the company. If it was lost it was the company's loss, not appellant's. If he improperly or fraudulently converted it to his own use, he was liable to the company and not to the plaintiff in this suit. There was no privity or trust relation between him and them in this regard.

We think appellant has shown no right to relief in this suit, that the demurrer was properly sustained, and the decree of the Circuit Court dismissing the bill is, therefore,

*Affirmed.*