## WANNAMAKER v. EDISTO NAT. BANK OF ORANGEBURG et al.

### No. 3345.

Circuit Court of Appeals, Fourth Circuit.
Jan. 10, 1933.

Irving F. Belser, of Columbia, S. C. (Melton & Belser, of Columbia, S. C., on the brief), for appellant.

J. B. S. Lyles, of Columbia, S. C., and Robert Lide, of Orangeburg, S. C. (Lide & Felder and M. E. Zeigler, all of Orangeburg, S. C., on the brief), for appellees.

Before NORTHCOTT and SOPER, Circuit Judges, and PAUL, District Judge.

SOPER, Circuit Judge.

The appeal in this case is taken from a decree of the District Court whereby the bill of complaint was dismissed on motion of the defendants because the facts set out in the bill do not entitle the plaintiff to the relief sought. The suit was brought in equity by certain stockholders of the Orangeburg National Bank of Orangeburg, S. C., on behalf of themselves and all other stockholders who might care to come in, against the receiver of the bank appointed by the Comptroller of the Currency, and against the Edisto National Bank of Orangeburg, S. C., to enjoin a stock-holders' liability assessment under the national banking laws, and to secure an accounting for assets of the Orangeburg Bank coming into the possession of the Edisto Bank under a contract between the two institutions. During the progress of the hearing in the District Court, a copy of the contract and of a promissory note executed by the Orangeburg Bank in favor of the Edisto Bank were added to the bill of complaint as amendments. There are certain inconsistencies in the allegations of the bill which have been resolved in the following summary of the facts in accordance with the rule that, where allegations are contradictory, the pleader is bound by those most favorable to his opponent. 49 C. J. 119.

Thus it is alleged in the bill that on March 1, 1927, the Orangeburg Bank was solvent and its stock was worth more than its par value of $100 per share, and that the bank was then undergoing "a slow run" and several other banks were negotiating with a view to taking it over; while the contract recited that the capital stock of the bank was impaired, and it was in immediate danger of becoming insolvent. Moreover, the bank did then actually retire from active business in order to avert this catastrophe, and all of its assets, plus $100,000 in cash additional, contributed by the stockholders of the Orangeburg Bank, were turned over to the Edisto Bank for liquidation on the latter's promise to pay the debts; but the assets proved insufficient for the purpose. Under these circumstances, the allegation that the stock was worth more than par cannot be accepted. On the contrary, it is only reasonable to infer that on March 1, 1927, an emergency existed and that there was good ground to believe that the value of the assets could be conserved only by prompt action of the sort which the directors adopted.

Prior to March 1, 1927, when the contract in question was executed, the Orangeburg Bank had been for a long time an established banking institution in the city, with a good business and a desirable clientele. It had a capital stock of $200,000. Its assets consisted of stocks and bonds, real estate, notes and mortgages, cash and discounts, a banking house and fixtures, having a face value in excess of $1,865,108.15, at which figure they were carried on the books. The liabilities amounted to $1,481,048.94. Real estate, and notes and mortgages secured by real estate, represented a large part of the assets of the bank in the amount of $868,808.73. Under the circumstances above described, its directors were approached by the directors of the

Edisto Bank and negotiations followed which resulted in a written contract of March 1, 1927, executed by the respective officers of the two institutions. Under the agreement, the Edisto Bank assumed the payment of all the liabilities of the Orangeburg Bank, excepting, however, the stockholders' liability of the Orangeburg Bank under the law; and, in consideration thereof, the Orangeburg Bank paid to the Edisto Bank $100,000 in cash and conveyed to it certain selected assets, consisting of the banking house, stocks and bonds, and promissory notes, amounting to the sum of $670,850.80, and also delivered its demand note for $710,198.14, secured by collateral, and payable to the Edisto Bank with interest at 6 per cent. The Orangeburg Bank further conveyed to the Edisto Bank certain other assets, consisting of current and past-due bills receivable in the amount of $249,448.62, to protect the Edisto Bank against any loss on account of the notes and assets selected by it, and then as collateral security for the demand note.

Other collateral deposited with this note consisted of the note of the General Land & Investment Company, payable to the Orangeburg Bank, in the sum of $768,808.73, which was itself secured by real estate and loans on mortgages secured by real estate. The last-mentioned property had belonged to the Orangeburg Bank, and is included in the sum total of its assets above described. The agreement contemplated the sale of this property to the General Land & Investment Company for the sum of $100,000 in cash and its note for $768,808.73. The General Land & Investment Company was a corporation organized for the particular purpose of taking over these assets from the Orangeburg Bank, and the plaintiffs and other stockholders of the Orangeburg Bank were induced to subscribe the sum of $100,000 to the stock of the corporation because of representations by the Edisto Bank that thereby they would be relieved of any possible stockholders' liability assessment. There was, however, no agreement between the Edisto Bank and the stockholders of the Orangeburg Bank to this effect. On the contrary, as we have seen, the contract between the two institutions expressly provided that the Edisto Bank did not assume, amongst the liabilities of the Orangeburg Bank which it agreed to pay, the stockholders' liability of the Orangeburg Bank under the law.

The contract further provided that the selected assets, as well as all the collateral held by the Edisto Bank, should be collected and converted into money in such manner and for such consideration as the Edisto Bank should deem best, and that the net proceeds of the collections should be applied by it towards the payment of any loss that it might sustain in the collection of the selected assets, and then towards the payment of the demand note. A committee of the Orangeburg Bank was to be appointed to confer with a similar committee of the Edisto Bank as to any questions that might arise during the collection or liquidation of the assets, and, in case of disagreement amongst them, the President of the Edisto Bank should have the final decision. The Edisto Bank agreed that, after it had realized a sum from the selected assets and the assets pledged as collateral sufficient to offset any losses in collection and to pay the demand note, it would pay over the balance to the Orangeburg Bank.

The transfer of the assets to the Edisto Bank, contemplated by the contract, was duly made. The Edisto Bank moved its own banking business into the bank building formerly occupied by the Orangeburg Bank, and the latter institution ceased to function as a bank in active operation. On March 1, 1927, the Edisto Bank sent out a circular letter to the plaintiffs and to the general public that for the sum of $100,000 in cash and other satisfactory security, it had bought out the Orangeburg Bank and guaranteed its depositors. Statements of the directors of the two institutions were inclosed, and the public was invited to call or write for further information as to the details of the transaction. The letter was accompanied by a letter from the Orangeburg Bank advising former customers of that institution to deal with the Edisto Bank.

The Edisto Bank liquidated the assets of the Orangeburg Bank and paid off all its outstanding obligations, with the exception of a balance now due to the Edisto Bank upon the demand note of $710,198.14. In order to collect this balance, the Edisto Bank has called upon the Comptroller of the Currency, and the latter has appointed a receiver of the Orangeburg Bank to enforce the stockholders' liability under the National Banking Act (12 USCA § 64); and the receiver has called upon the stockholders to pay the face amount of their holdings, and has instituted suit against several of the plaintiffs and other stockholders to collect it.

The contract between the banks was approved by the board of directors of the Orangeburg Bank and also by the Comptroller of the Currency; but it was not approved by a two-thirds majority of the stock-

holders, and the complaining stockholders did not know the exact terms of the agreement. Nevertheless we must conclude that they were aware that their bank had ceased to operate and that its affairs in liquidation were being handled by the Edisto Bank, for they and many of the stockholders subscribed to stock of the General Land & Investment Company in the sum of $100,000 in order that it might take over the real estate and the loans secured by real estate of the Orangeburg Bank; and they also received the letter of March 1, 1927, from the Edisto Bank to the effect that it had bought out the Orangeburg Bank and guaranteed its depositors. During the period of five years in which the process of liquidation was going on, they made no objection and were only stimulated to action when demand was made upon them by the receiver for the payment of their extra liability as stockholders of the bank.

The prayer of the bill is that the Edisto Bank be required to account to and compensate the plaintiffs for the injuries they have sustained to the amount of the principal loss of their stock in the sum of $200,000; that the demand note should be declared null and void, the appointment of the receiver should be vacated, and the suits against the stockholders to collect the assessment should be permanently enjoined.

■■ In addition to specific allegations of fact, the bill of complaint abounds in charges of a fraudulent scheme and design on the part of the Edisto Bank, in general terms, but they are mere conclusions of the pleader, and no facts are stated from which fraud or conspiracy can be legitimately inferred. General charges of this sort are not sufficient, unless the transactions to which they refer are such as in their essential nature to constitute a fraud. Van Weel v. Winston, 115 U. S. 228, 237, 6 S. Ct. 22, 29 L. Ed. 384; Fogg v. Blair, 139 U. S. 118, 11 S. Ct. 476, 35 L. Ed. 104. Thus there is an allegation that the Edisto Bank conceived and entered into a fraudulent scheme to acquire possession of the assets of the Orangeburg Bank without the approval of the stockholders; that, in order to carry out this design, the directors of the Edisto Bank approached the directors of the Orangeburg Bank with the proposition that was ultimately accepted; that the Edisto Bank, in order to induce the acceptance of the proposition, represented that the Orangeburg Bank was solvent, and that the arrangement would relieve the stockholders from any possible stockholders' liability assessment and provide for the orderly liquidation of the assets of the Orangeburg Bank. There is the added allegation to the effect that the stockholders were induced to subscribe $100,000 to the stock of the General Land & Investment Company by representations of the Edisto Bank that they would be saved thereby from an assessment on this stock; but at most predictions only were involved and not representations of a past or existing fact. No liability was fastened upon the Edisto Bank as to these contingent and uncertain matters. Gordon v. Butler, 105 U. S. 553, 26 L. Ed. 1166; Southern Development Co. v. Silva, 125 U. S. 247, 8 S. Ct. 881, 31 L. Ed. 678.

Certain allegations of the bill as to the manner in which the assets of the Orangeburg Bank were disposed of by the Edisto Bank are likewise ineffective. It is charged that the Edisto Bank allowed the assets of the Orangeburg Bank to be dissipated and failed to dispose of them as it might have done to pay off all its obligations. No details are given, and it is not shown that the liquidation of the assets was accompanied by neglect on the part of the Edisto Bank as distinguished from mere mistake in judgment from which the failure to sell the assets for enough to pay the debts may have followed. It is clear that the selfish interests of the Edisto Bank would have impelled it to collect at least enough money to repay it for its own outlay.

The gist of the stockholders' contention, stripped of unessential allegations, is that the arrangement between the two banks amounted to a virtual liquidation and closing of the Orangeburg Bank when it was solvent, and that the directors of a solvent national bank have no right, without the approval of the stockholders owning two-thirds of the stock, to put the bank into liquidation and turn over all of its assets to another bank; that, such approval not having been obtained in this case, it was ultra vires for the directors of the bank to convey its assets to the Edisto Bank, and unlawful for the latter to receive them, and, having done so at a time when the assets were worth more than the liabilities, the Edisto Bank is bound to compensate the stockholders for the value of their stock in the Orangeburg Bank and to exonerate them from the assessment for their stockholders' liability.

■■ It cannot be denied that the function of the directors of a corporation is to manage its affairs in active operation, and that they have no inherent power to wind up its affairs by sale or liquidation of all of its assets. Power to take fundamental corporate action of this sort is uniformly reserved by

corporation statutes to the stockholders as a body, and, in the case of national banks, the provision of R. S. § 5220, 12 U. S. C. § 181 (12 USCA § 181), is that any association may go into liquidation and be closed by the vote of its shareholders owning two-thirds of its stock. These provisions, however, are designed to govern the actions of a board of directors in conducting the affairs of a solvent going concern, and not to render the board powerless to act so as to safeguard the assets when the corporation is insolvent or in imminent danger of becoming so. We agree with the conclusions of the Eighth Circuit in City National Bank of Huron v. Fuller (C. C. A.) 52 F.(2d) 870, 79 A. L. R. 71, where it was held that a transfer of assets, in consideration of an assumption of a liability, by one national bank on the verge of insolvency to another, was within the general authority of the board of the failing bank under R. S. § 5136 (7), 12 U. S. C. § 24 (7), 12 USCA § 24 (7), to exercise all such incidental powers as should be necessary to carry on the business of banking. An emergency existed in the pending case, and hence the directors had the power to prevent the sacrifice of the assets and to transfer them to a going concern by which they could be reduced to money under more favorable conditions. See Wyman v. Wallace, 201 U. S. 230, 26 S. Ct. 495, 50 L. Ed. 738; Chase v. Hall (C. C. A.) 30 F.(2d) 195.

Even if the board of directors was not justified by the existence of an emergency in proceeding without the previous approval of the stockholders, the complainants in this case may not be heard at this time to question their action. The contract was within the powers of the Orangeburg Bank, and the only defect charged is that the power was not exercised in the regular manner prescribed by the statute. If this point had been raised by the complainants at the time in appropriate proceedings, and they had been found to be well grounded, the performance of the contract would doubtless have been enjoined. Instead they not only acquiesced in the transaction with knowledge that the transfer of the assets of their bank had taken place, but also co-operated to carry the plan of liquidation into effect by subscribing to the fund of $100,000 that formed a substantial part of the consideration of the liquidating bank. In like situations, ratification by shareholders of acts of a board of directors within the power of the corporation, but irregularly performed, has been held to arise by implication. It is sufficient to say here that the complainants,

having acquiesced, with knowledge, in the performance of the contract, and having accepted its benefits, are estopped now to challenge its validity when they are disappointed in the hope that they would be saved thereby from an assessment upon their stock. Zabriskie v. Cleveland, etc., R. Co., 23 How. 381, 16 L. Ed. 488; Stokes v. Detrick, 75 Md. 256, 263, 23 A. 846; Bensiek v. Thomas (C. C. A.) 66 F. 104; West Side Irrigation Co. v. U. S. (C. C. A.) 246 F. 212, 218; Johnson v. King-Richardson Co. (C. C. A.) 36 F. (2d) 675, 67 A. L. R. 1465; Scott v. Norton Hardware Co. (C. C. A.) 54 F.(2d) 1047.

The case therefore must fail, in so far as it comprehends the charge that the Edisto Bank, having unlawfully obtained possession of the assets of another solvent bank, is under an obligation to account for their value to the shareholders of the latter institution. The attempt in the bill to vacate the appointment of the receiver made by the Comptroller of the Currency and to enjoin the collection of the assessment upon the shareholders authorized by him, must likewise fail. We are dealing here with the extent of the power of the Comptroller to appoint a receiver for an insolvent bank, and to call for a ratable assessment upon its shareholders under the Act of June 30, 1876, § 1, 12 U. S. C. § 191 (12 USCA § 191); and it is settled that the determination as to the solvency of a national bank, and the necessity of an assessment against its shareholders, and the amount thereof, is committed exclusively to the judgment and discretion of the Comptroller, and it is not subject to judicial review. Liberty National Bank v. McIntosh (C. C. A.) 16 F. (2d) 906; Bushnell v. Leland, 164 U. S. 684, 17 S. Ct. 209, 41 L. Ed. 598. It has recently been held in Crawford v. Gamble (C. C. A.) 57 F.(2d) 15, that a shareholder of an insolvent national bank, sued by the receiver for an assessment on the stock, cannot defend the action on the ground that without his knowledge or consent, or the authority of the stockholders of the bank, certain directors and shareholders of the bank had united with other persons to organize a new bank, and caused the two banks to enter into a contract, looking to the liquidation of the old bank, under circumstances quite similar to those in the case at bar.

The decree of the District Court is affirmed.

PAUL, District Judge.

I concur in the result.